**BAUERS** *v.* **BULL.**

78 Pac. 757.

PLEADING PURPOSE OF DIVERTING WATER—BURDEN OF PROOF.

1. An answer, in an action to restrain diversion of water, alleging continuous adverse user of the water for more than ten years, imposes on defendant the burden of proof in sustaining such allegation.

PRESUMPTION AS TO NATURE OF USE BY DECEASED CLAIMANT.

2. Where a deceased person probably attempted to assert an adverse claim of possession, the presumption is that it was initiated under a claim of right, and the burden then rests on the person against whom the adverse possession or use is asserted to show that the deceased and his successors were licensees.

EVIDENCE OF ADVERSE USE.

3. The evidence presented does not show that the claim of adverse use of the waters of Hot Springs Creek is well founded.

From Lake: HENRY L. BENSON, Judge.

Statement by MR. CHIEF JUSTICE MOORE.

Suit for an injunction by Frank D. Bauers against John Bull to enjoin interference with the flow of water in a nonnavigable stream. The complaint states that plaintiff is the owner of a section of arid land in Lake County through which a creek flows southwesterly in a natural channel, carrying about one hundred inches of water, miners' measurement, and that about July 27, 1901, the defendant unlawfully entered his premises and constructed a dam in the stream, dug a ditch therefrom, and diverted all the water thereof, to plaintiff's irreparable injury. The answer denies the material allegations of the complaint, and for affirmative relief avers that defendant owns one hundred and sixty acres of land joining plaintiff's on the south, through which the creek also flows; that in 1886 his predecessor in interest dug the ditch in question, and during every season thereafter diverted the water from the stream, and used it in irrigating crops grown on the land now owned by defendant, which use has at all times been open, notorious, continuous, adverse, and under a claim of right, whereby a title by prescription has been secured to continue the use of the water flowing in the stream for the purposes stated; that July 27, 1901, the defendant entered upon plaintiff's premises to repair the ditch, which act constitutes the trespass alleged in the complaint; and that for more than ten years prior thereto he and his predecessor in interest have repaired the ditch, causing the water to flow therein. The reply having put in issue the allegations of new matter in the answer, a trial was had, resulting in a decree awarding to defendant the use of the water for irrigation, and authority to maintain the dam and ditch, and plaintiff appeals.                         . REVERSED.

For appellant there was a brief over the names of *W. A. Wilshire* and *J. M. Batchelder,* with an oral argument by *Mr. Batchelder* and *Mr. Chas. A. Cogswell.*

For respondent there was a brief and an oral argument by *Mr. Asa Connor Hough.*

MR. CHIEF JUSTICE MOORE delivered the opinion.

It is contended by plaintiff's counsel that the right to divert the water flowing through their client's premises is based on an alleged adverse user thereof for irrigation, and that the testimony fails to show that either the defendant or his predecessor in interest used water for that purpose, except possibly one season, or for any purpose, continuously during any period of ten years, and for these reasons the court erred in decreeing a right to use the water for irrigation, and in not granting plaintiff the relief which he demands. The testimony shows that Hot Springs Creek flows southwesterly, in a well-defined channel, into section 5, township 39 south of range 20 east of the Willamette Meridian, which is owned by plaintiff, where the stream forks, the eastern branch proceeding southerly to the northeast quarter of section 8, in that township and range, which is owned by defendant. The east fork of the stream originally terminated in the dry season on the north end of defendant's premises, where the water flowing therein spread over and percolated the western part of his land, causing it to produce good crops of wild hay; that in the fall of 1886 David Cleland, Sr., being the owner of the real property last above described, constructed a ditch, designated on a plat offered in evidence as "Ditch B," from Hot Springs Creek, commencing in section 5, in such township and range, at a point above the forks of that stream, whereby the water thereof was diverted and conducted to the northeast forty acres of his land; that in 1891 he died seized of these premises, and the defendant, having secured from his heirs the title thereto, opened this ditch in July, 1901, which had become filled with sediment, whereupon this suit was instituted.

David Cleland, Jr., as defendant's witness, testified that in the fall of 1887 he helped construct a ditch from the channel of the east fork of Hot Springs Creek easterly along the northern border of the northeast quarter of section 8, and first saw Ditch B, which he observed every year thereafter until 1899; that, his father having died in 1891, the witness entered into, and for seven years thereafter retained, possession of this land, all of which, except the northeast forty acres thereof, was naturally irri-

gated by the water from that branch, which, until he left the
premises, constantly flowed therein, except about one month each
year, when the entire volume, or nearly all of it, would be turned
into Ditch B, causing it to flow to the northeast quarter of the
northeast quarter of section 8, thereby rendering the irrigated
part dry, and permitting the hay thereon to be cut; and that
during the years mentioned no person ever questioned the right
to repair Ditch B, or to use the water flowing therein; that the
forty acres on which that ditch terminated was originally covered
with wire grass and sagebrush, but about 1890 it was reduced
to cultivation, and wild grass was thereafter raised thereon,
which, in the opinion of the witness, could not be produced with-
out irrigation.   On cross-examination, in referring to the time
the witness left the land of which his father died seized, he
was asked—

"Q. Then you did some work there in irrigating this land—
the northeast quarter of section 8 in this ditch—most of those
years?

A. Yes.

Q. What particular years?

A. Well, as far as being positive, I done it every year.   I
would not swear positive I done it every year, but I always went
down and helped my father in haying time, and we changed the
water back and forth there.   It seems to me every year I helped
him in haying.

Q. If there was a ditch there, it didn't require very much
changing to turn the water down onto the northeast quarter of
8, did it?

A. No.   We put a dam in there, and turned the water there
while we cut the hay on the other side."

J. H. Bull, brother of and witness for the defendant, having
testified that he helped make Ditch B, was asked:

"How many years after 1886 were you familiar with the
ditch which you say you assisted Mr. Cleland in constructing?"
and replied: "In 1891, I cut the hay on section 8 of Mr. Cle-
land's land, and used the water from the ditch to irrigate the
hay.   *   *

Q. What proportion of the water of Hot Springs Creek was
diverted into the ditch which you assisted in constructing in
1886?   How much water would the ditch carry?

A. In haying time the ditch would carry all the water that
came from Hot Springs Branch.

Q. What was the ditch used for, Mr. Bull?

A. To dry a part of the meadow, partly. They could only cut one part of the meadow with the water running on the other part. I don't know as I can explain fully; I can say they would turn the water on the other side of the meadow.

Q. Which side?

A. It don't matter, either side, and cut the side they turned the water off from, and turned it back and cut the other side. * *

Q. What was the effect on the ground in the northeast part of section 8 after this ditch was constructed in 1886?

A. Oh, it made the grass grow. * * .

Q. Now, during the time you were cutting hay on the west half of the northeast quarter of section 8, you say you diverted the water to the east half, through this ditch, marked on plaintiff's exhibit A, 'Ditch B.' What effect did that have on the west half of the northeast quarter?

A. Left it without water.

Q. Then, after the hay was cut, what did you do with the water?

A. Turned it back in the channel.

Q. And where did it go to?

A. Went down on the west half.

Q. Then that had the effect of drying the east half?

A. Yes, sir."

The witnesses A. L. Howell and J. W. Howard say that David Cleland, Sr., used the water flowing in Ditch B without stating the purpose for which it was employed. William Metzger, another witness for the same party, testified that in 1892, and the year following, he used the water from this ditch for his stock, which he pastured and fed on the land now owned by the defendant.

This constitutes the entire direct testimony, tending to show the purpose for which the water was diverted and used, and, except in 1891, when J. H. Bull cut the hay, there is an entire failure to show that the water was ever used for irrigation. There may be an inference that it was so used on the northeast quarter of the northeast quarter of section 8, from the statement that wild grass might not grow thereon without artificial application of water. This inference is weakened, however, by the testimony of David Cleland, Jr., whose attention having been called to that part of the land by the following question: "State whether or

not it will raise crops if not irrigated?" replied, "I don't think it would." We think a fair analysis of the testimony conclusively shows that Ditch B was constructed, and the water diverted thereby, not for the purpose of irrigation, but as a means of preventing it, during the haying season, from flowing in the channel of the east fork to and upon Cleland's hay land, thereby permitting the water to evaporate and to be absorbed, so that the crop could be harvested. The testimony shows that, from the fall of 1886 to 1894, Ditch B was probably the means adopted to drain the hay land, and the water flowing therein was used by Metzger, for two years immediately preceding the latter date, in caring for his stock. It is very doubtful, however, if the ditch was thereafter used until July, 1901, when the defendant reconstructed it. In speaking of the ditch in 1893 and the succeeding year, the defendant, as a witness in his own behalf, testified that it carried all the water of Hot Springs Creek at low stage, and referring to the ditch and the water which it carried, as compared with their condition in 1893 and 1894, he says: "I supposed they were always kept so; never knew they were not until I came back in October, 1900," when there was no water on the place. This ditch in 1901 was full of sediment, and in July of that year, when it was reopened, very heavy sods were plowed up. William Harvey, a witness for plaintiff, testified that, as lessee, he was in possession of the northeast quarter of section 8, and, referring to the time of his occupancy, was asked: "You may state if, during the period from 1899 to 1900, you ever observed such a ditch there?" and answered: "No, sir. I don't know of any ditch of that kind at that time. There might have been a low place there or something, maybe a little washout for a short distance, but no ditch that I know of."

1. The answer having alleged, as the basis of affirmative relief, a continuous adverse user for more than ten years of the water flowing in Ditch B for the purpose of irrigation, the burden of establishing that fact was thus imposed on the defendant. We think an examination of the testimony, the substance of which has been detailed, shows that after the death of David Cleland,

Sr., the water diverted from Hot Springs Creek by Ditch B was only used for irrigation in 1891.

2. In case of the death of a person who probably attempted to assert an adverse user of an easement, as his declarations to that effect would be in his own interest, and therefore inadmissible (*Low* v. *Schaffer,* 24 Or. 239, 33 Pac. 678; *Poorman* v. *Miller,* 44 Cal. 269; *Fischer* v. *Bergson,* 49 Cal. 294), the law, from the mere use, invokes a presumption that it was initiated under a claim of right, thereby imposing on the adverse party the burden of proving that the use was in pursuance of a license: *Rowland* v. *Williams,* 23 Or. 515 (32 Pac. 402). As the statute of limitations had not fully run at the time David Cleland, Sr., died, the use of the water for the remainder of the term of ten years should have been shown by testimony that clearly established that fact. A careful examination of it, however, convinces us that Ditch B was used only as a means of draining the hay land, and not for the purpose of conducting the water therein for irrigation, except during one season, and hence the continuation of the use of the water for that purpose must be denied.

3. The testimony further shows that a part of plaintiff's land is naturally irrigated by the water flowing in the channels of the branches of Hot Springs Creek, thereby producing grass and hay, which he needs in pasturing and feeding stock, in which business he is engaged. The use of the water by Ditch B for the purpose of draining the hay land on the northeast quarter of section 8 has not, in our opinion, been continuous for any period of ten consecutive years. As plaintiff and defendant are riparian proprietors on this stream, and each is entitled to an equitable share of the water thereof, we think defendant has failed to establish a right to maintain Ditch B, even to drain his hay land, when by doing so the water diverted thereby would deprive plaintiff of its reasonable use.

The decree will therefore be reversed, and one entered here enjoining the defendant from maintaining Ditch B, or diverting water thereby.                                   REVERSED.